IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03514-DDD-KAS

RIFLE ONION COMPANY, LLC, a Colorado limited liability company,

    Plaintiff/Counter-Defendant,

v.

ROBERT HELLMAN, individually;
JAMES HILL, individually; and
LABYRINTH HOLDINGS LLC, a California limited liability company,

Defendants/Counterclaimants/Third-Party Plaintiffs,

v.

MACARIO CARRILLO, an individual and Colorado citizen,

    Third-Party Defendant.
_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

This matter is before the Court on the parties' briefing regarding certain privilege and confidentiality issues as they relate to a report written by Alvin Horton, who conducted an audit of Defendants' finances, initially at the parties' agreement and then pursuant to court order. The Court sought briefing to resolve the privilege and confidentiality questions in advance of the audit report's release. In essence, Defendants seek a protective order to limit the information disclosed in that report. Thus, the Court construes Defendants' arguments as an oral **Motion for a Protective Order** stemming from arguments raised at a November 14, 2024 status conference, *see Am. Courtroom Minutes* [#130].

The Court has reviewed **Defendants' Brief Concerning Privilege** [#132] ("Defs' Brief"), Plaintiff's Response [#133], Defendants' Reply [#134], the entire case file, and applicable case law.

The Court received Mr. Horton's final audit report on January 6, 2025. To ensure that the contents of the report do not influence the Court's decision, the Court has not reviewed the report prior to this Order's issuance.

For the reasons discussed below, the Court orders the release of the audit report to all parties' counsel. Because no protective order governing discovery exists in this case, the Court orders that the audit report be treated as "attorney's eyes only," subject to any party's challenge to that designation.[1]

## I.    Background

This case arises from a business arrangement gone bad. The parties are intimately familiar with the facts. Thus, the Court provides the following factual overview for context.

In August or September 2019, Plaintiff Rifle Onion Company LLC ("Rifle Onion") and Defendants Robert Hellman, James Hill, and Labyrinth Holdings, LLC ("LabX Group") entered into a contract for the LabX group to process Plaintiff's (and other farmers') hemp and convert it into cannabidiol ("CBD") free of Tetrahydrocannabinol ("THC"), a psychoactive compound. *See Compl.* [#1] ¶¶ 14, 23. As the business arrangement got underway, Defendants appeared under-funded and ill-equipped, and they struggled to meet their obligations under the contract. *Id.*, ¶¶ 16, 17, 20-21, 26-27, 29, 41. Plaintiff

---

[1] A nearly identical Order has been contemporaneously issued in the related case, *CBD970, LLC v. Labyrinth Holdings, Inc.*, *et al.*, No. 20-cv-00617-DDD-KAS.

asserts that it lost considerable sums because of the LabX Group's inability to perform under the contract. *Id*., ¶¶ 24, 28, 30, 34, 42. As a result, on November 28, 2020, Plaintiff commenced this lawsuit and lodged claims of breach of contract; common law fraud in the inducement, and civil theft. *Compl.* [#1] at 10-13.

On July 3, 2023, in both the above-captioned case and the related case, *CBD970, LLC v. Labyrinth Holdings, Inc., et al.* No. 20-cv-00617-DDD-KAS ("*CBD970*"), the parties filed an Agreed Motion to Stay Case [#77] ("Motion to Stay") in which they sought a stay of proceedings to permit an agreed-upon audit by Alvin C. Horton, CPA, to proceed "with the hope of the Parties reaching a final resolution all to their own." *Motion to Stay* [#77] ¶¶ 2, 3. The Motion referenced and attached "The Parties['] Memorandum of Understanding in Conformity with the Court's May 8, 2023 Ruling[2] [Doc. 76]" [#77-2], [#77-3], and it referenced the engagement letter between Defendants and Mr. Horton. *Motion to Stay* [#77], ¶ 2. The MOU and Engagement Letter articulate the audit's purpose and scope, and they contain provisions concerning the confidentiality of documents and information Defendants would provide to Mr. Horton. On September 7, 2023, the Court granted the stay request pending resolution of the audit. *See Minute Order* [#80].

On September 25, 2023, Mr. Horton notified defense counsel that he was terminating the audit because of Defendants Labyrinth Holdings, Inc.'s, Hellman's, Hill's, and Labyrinth Holdings LLC's (the LabX Parties') failures to "substantial[ly] compl[y]" with

---

[2] On May 8, 2023, the previous Magistrate Judge assigned to this case invited the parties to file an unopposed motion to stay to allow any agreed upon audit to proceed. *Minute Order* [#104] at 2.

his document and information requests. *See Audit Termination Letter* [#81-1] at 4; *see also MOU* [#77-2] at § I(E) (defining "LabX parties"). At the parties' request, the Court lifted the stay and invited any briefing "related to the audit and/or any of the parties' conduct." *See Minute Order* [#85]. In response to that invitation, Plaintiff filed a Motion to Enforce Parties' Memorandum of Understanding, Including Certificate of Conferral [#120], seeking, in relevant part, the audit's completion. *See Motion to Enforce* [#91] at 8-9.

On June 12, 2024, the Court held a hearing on Plaintiff's fully briefed Motion to Enforce. *See Courtroom Minutes* [#112]. Following argument by counsel, the Court ordered the audit to resume and appointed Mr. Horton to conduct the audit. *Id*. at 2. The Court further ordered Labyrinth Holdings LLC to continue to pay for the cost of the audit pursuant to the MOU and Engagement Letter with Mr. Horton. *Id*.

On November 14, 2024, the Court held a status conference to discuss the audit's status and the anticipated completion date of the auditor's report. *See Am. Courtroom Minutes* [#130]. The Court also raised questions about whether the mediator's privilege identified in the MOU and the Engagement Letter precluded the auditor from discussing the basis for his conclusions and whether the crime-fraud exception negates any applicable mediator's privilege. *See id*. The Court then set a briefing schedule for the parties to address the privilege issues that may impact Plaintiff's counsel's access to information contained in the auditor's anticipated report and Plaintiff's counsel's ability to depose Mr. Horton regarding his investigation and findings. *Id*.

A.    **Parties' Memorandum of Understanding ("MOU") [#77-2]**

The parties to the MOU are Plaintiff Rifle Onion, Third-Pary Defendant Macario

Carrillo, Defendants Robert Hellman and James Hill, and Defendant/Counterclaim

Plaintiff Labyrinth Holdings, Inc. *MOU* [#77-2] at 2-3. The MOU describes its purpose and

intent as follows:

> The course of this litigation has caused tremendous, adverse stress upon
> all parties hereto. . . . **The Parties acknowledge that much of this case
> pivots upon the underlying finances centered in this litigation** and as
> such, have agreed to retain a forensic CPA to conduct an audit of the
> Defendant(s) in conformity to the scope outlined in the retainer/service
> agreement of Alvin C. Horton, C.P.A. . . . . Defendants have already retained
> Mr. Horton and have already began [sic] suppl[y]ing Mr. Horton with
> requested documentation. The audit is underway.

*Id.* § II (emphasis added).

Additionally, the MOU memorializes the parties' agreement "that the Engagement

Letter/Agreement [between Defendant Labyrinth Holdings LLC and Mr. Horton] should

sufficiently speak to the terms of the audit," and it contains the following agreements as

to the audit's process:

- "The scope of the Audit and its limitations are set forth within the Engagement
  Letter." *Id.* § IV(6).

- "Pursuant to the Engagement Letter, **any documents and information
  provided to Mr. Horton by Defendants will be subject to a mediator's
  privilege and is** [sic] **to remain confidential and will not be subject to
  subpoena.**" *Id.* § IV(8) (emphasis added).

- "Upon completion of the Audit by Mr. Horton, Mr. Horton shall issue and file a
  Report (the 'Report') with the Parties. This Report shall provide whether the
  [sic]: Auditor's conclusion with respect to Labyrinth Holdings LLC financial
  condition; Auditor's reasonable determination whether or not Labyrinth
  Holdings LLC and/or its principals have engaged in material financial
  misdealing's [sic] or inappropriateness, as determined by the Auditor; or a
  statement that Auditor is unable to make any findings as to Labyrinth Holdings

LLC's financial condition because Defendants have failed or refused to participate in the Audit or failed or refused to submit the needed and requested documentation. **The Auditor might also comment on whether Labyrinth Holdings LLC funds were improperly moved to evade creditors, syphon off monies out of the company leaving the company improperly capitalized, has or should have assets and if not that the assets were properly disposed of and were arm's length transactions (or not), improperly placed liabilities onto their books, failed to record assets or values on the books, had possession or control of unreported assets, made improper distributions, had third parties or the defendants personally take value(s) that should have gone to or remained in the company, improperly caused damage or disposed of assets, or improperly diverted monies or assets**." *Id.* § IV(11) (emphasis added).

- "Governing Law. The Federal Laws of the State of Colorado, USA." *Id.* § V(B).

- "Venue. Colorado Federal District Court." *Id.* § V(C).

- "If any provision of this Agreement is declared invalid or unenforceable by a court of competent jurisdiction . . . . [t]he Parties do hereby agree that a Court of competent jurisdiction shall have 'blue pencil' rights to modify this agreement pursuant to the law." *Id.* § V(E).

## B.    Engagement Letter between Defendants and Mr. Horton [#91-1] at 18-21

The signatories to the engagement letter are Defendant Hill and Defendant Hellman, both as personal guarantors, Defendant Labyrinth Holdings LLC, Labyrinth Holdings Inc., and auditor Alvin C. Horton. *Engagement Letter* [#91-1] at 20. The engagement letter described the audit's purpose akin to how the MOU describes it:

The objective of the accounting services is to determine whether Labyrinth Holdings LLC funds were improperly moved to evade creditors, syphon off monies out of the company leaving the company improperly capitalized, has or should have assets and if not that the assets were properly disposed of and were arm's length transactions (or not), improperly placed liabilities onto their books, failed to record assets or values on the books, had possession or control of unreported assets, made improper distributions, had third parties or the defendants personally take value(s) that should have gone to or remained in the company, improperly caused damage or disposed of asserts, or improperly diverted monies or asserts.

6

*Id.* at 18.

The engagement letter's most salient provisions include:

- "[T]he documents [the LabX Parties] shall provide shall remain confidential and privileged, even from Plaintiffs' counsel, **unless a Court of competent jurisdiction says otherwise.**" *Id.* at 19 (emphasis added).

- "Upon completion of the work, [Mr. Horton] shall be asked to prepare a condensed report stating that: (1) the work was completed, and no forensic inconsistencies or improprieties were found as to the issues [underlying the audit's objectives]; (2) the work was completed and yes, forensic inconsistencies or improprieties were found as to the issues [underlying the audit's objectives; or (3) [Mr. Horton] was unable to complete the work [for a particular, identified reason]. *Id.*

Importantly, the Engagement Letter identifies "Sevier County, Tennessee," as the jurisdiction to litigate all disputes "aris[ing] out of or stemming from [the Engagement Letter], and Defendants and Mr. Horton agreed that Tennessee law would govern all such disputes. *Id.* Thus, the Court considers the Engagement Letter's provisions only to the extent that the MOU incorporates them by reference and to the extent that those provisions facilitate the Court's construction of the MOU.

## II.    Legal Standards

### A.    Fed. R. Civ. P. 26 and Protective Orders

The Federal Rules of Civil Procedure permit parties to obtain "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," considering factors including "the parties' relative access to relevant information" and "the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(1).

Federal Rule of Civil Procedure 26(c)(1) permits "[a] party or any person from whom discovery is sought [to] move for a protective order in the court where the action is pending," and, for good cause, a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" A court may forbid the discovery, specify the terms for the disclosure or discovery, prescribe the discovery method, and forbid or limit inquiry into certain matters, among other actions. Fed. R. Civ. P. 26(c)(1)(A)-(H).

**B.    Contract Interpretation and Resolving Competing Contractual Provisions**

The MOU contains a "Federal Laws of the State of Colorado" choice of law provision, *see MOU* [#77-2] at 5, however, state law governs contract interpretation. *See Flood v. ClearOne Commc'ns, Inc.*, 618 F.3d 1110, 1117 (10th Cir. 2010). Thus, the Court applies Colorado's contract-interpretation laws. When interpreting a contract, courts primarily seek "to determine and give effect to the intent of the parties." *CapitalValue Advisors, LLC v. K2D, Inc.*, 321 P.3d 602, 605 (Colo. App. 2013). To determine parties' intent, courts examine the contract's language; "[w]ritten contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language." *Id.* (quoting *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo. 2000)).

To determine "the plain and ordinary meaning of words, [courts] may consider definitions in a recognized dictionary." *Owners Ins. Co. v. Dakota Station II Condo. Ass'n, Inc.*, 443 P.3d 47, 51 (Colo. 2019) (quotation marks and citation omitted). "A contract is ambiguous where it is reasonably susceptible of more than one meaning"; however, the

8

parties' mere disagreement "concerning the meaning of terms does not create an ambiguity." *Colo. Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.*, 207 P.3d 839, 841 (Colo. App. 2008) (internal quotation marks and citation omitted). To determine "whether an ambiguity exists, the court may look to the meaning of words with 'reference to all contractual provisions and the nature of the transaction which forms the contract's subject matter.'" *Stroh Ranch Dev., LLC v. Cherry Creek S. Metro. Dist. No. 2*, 935 F. Supp. 2d 1053, 1060 (D. Colo. 2013) (quoting *In re Marriage of Thomason*, 802 P.2d 1189 (Colo. App. 1990); *May v. United States*, 756 P.2d 362, 369 (Colo. 1988) (*en banc*)).

"[C]ourts must *not* view clauses or phrases in isolation." *Stroh Ranch Dev.*, 935 F. Supp. 2d at 1060 (internal citation and quotation marks omitted) (emphasis in original). "When faced with conflicting provisions in a contract, a court should adopt, if possible, a reasonable interpretation of the contract that gives effect to all its provisions. When two clauses of a contract are in apparent conflict, the clause that gives effect to the primary purpose of the contract will control." *White River Vill., LLP v. Fid. and Deposit Co. of Md.*, Nos. 08-cv-00248-REB-BNB, 08-cv-00359-REB-BNB, 2009 WL 792728, at *3 (D. Colo. Mar. 23, 2009) (internal citations and modification omitted).

### III.    Analysis

The parties entered into the MOU sometime in June 2023, more than three years after the *CBD970* litigation's commencement and more than two-and-a-half years after the *Rifle Onion* litigation's commencement. *See MOU* [#77-3] at 8 (document history). In entering into the MOU, the parties shared a desire to "minimize further damage" resulting from the litigation, which "has caused tremendous, adverse stress upon [everyone]."

Thus, the parties agreed upon an audit of the LabX Parties' "underlying finances" because "this case pivots upon [those] underlying finances[.]" *MOU* [#77-2] at 3-4 §§ II, III. Plaintiff's brief intimates that any auditor findings that the LabX Parties' have no collectable assets (and, thus, that the LabX entities are judgment proof) might prompt Plaintiff to forgo further litigation. *See Plaintiff's Response* [#133] at 4 ("Throughout most of 2022 and thereafter, each of the LabX Parties claimed that they were judgment proof"; thus, "the prior Magistrate Judge . . . advised the parties to focus on whether the LabX Parties were judgment proof as the LabX Parties continued to claim 'bankruptcy'").

The MOU explicitly incorporates by reference the Engagement Letter between Defendants and Mr. Horton. *See*, *e.g.*, *MOU* [#77-2] at 4, § IV(1). That Engagement Letter defines the audit's objectives to determine whether Labyrinth Holdings LLC: (1) funds "were improperly moved to evade creditors"; (2) funds were "syphon[ed] off . . . out of the company leaving the company improperly capitalized"; (3) "assets were properly disposed of and were arm's length transactions (or not)"; (4) "improperly placed liabilities onto [its] books"; (5) "failed to record assets or values on the books"; (6) "had possession or control of unreported asserts"; (7) "made improper distributions"; (8) "had third parties or the defendants personally take value(s) that should have gone to or remained in the company"; (9) or "improperly caused damage to disposed of assets, or improperly diverted monies or asserts." *Engagement Letter* [#91-1] at 18.

With the audit's agreed-upon purpose in mind, the Court considers to what extent the MOU allows the auditor's report to be disclosed to all parties without any redactions,

even if it might contain information beyond the auditor's mere conclusions as to whether financial improprieties did or did not occur.

## A.    Construction of the MOU and the Engagement Letter's Terms

The MOU unambiguously states, "[u]pon completion of the Audit by Mr. Horton, Mr. Horton shall issue and file a Report (the 'Report') with the Parties." MOU [#77-2] at 3, § IV(11). This sentence's plain meaning renders clear that both sides are to receive a copy of Mr. Horton's Report.

The MOU then describes the types of information the Report "shall"[3] contain: (1) the "Auditor's conclusion with respect to Labyrinth Holdings LLC financial condition;" (2) the "Auditor's reasonable determination whether or not Labyrinth Holdings LLC and/or its principals have engaged in material financial misdealing's [sic] or inappropriateness, as determined by the Auditor"; "or" (3) "a statement that Auditor is unable to make any findings as to Labyrinth Holdings LLC's financial condition because Defendants have failed or refused to participate in the Audit or failed or refused to submit the needed and requested documentation." *Id*.

"Conclusion" means, "a reasoned judgment" or "the necessary consequence of two or more propositions taken as premises." *Conclusion*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993). "Determination" means, "the resolving of a question by argument or reasoning." *Id*. And "reasonable" in this context means, "being in accordance with reason," *i.e.*, a "theory". *Id*. Accordingly, the MOU's plain meaning

---

[3] "As used in statutes, contracts, or the like, this word is generally imperative or mandatory." *Shall*, BLACK'S LAW DICTIONARY (6th ed. 1991).

11

suggests that the parties are to receive a copy of Mr. Horton's report, without redactions of information that support his reasoned judgment and resolve the parties' questions as to Labyrinth Holdings LLC's financial condition and whether Labyrinth Holdings LLC and/or its principals engaged in financial misdealing and improprieties. *See MOU* [#77-2], §IV(11).

The MOU also allows the Auditor to "comment on" additional types of information regarding Labyrinth Holdings LLC funds: (1) "whether . . . funds were improperly removed to evade creditors"; (2) whether "monies" were "syphon[ed] . . . out of the company leaving the company improperly capitalized"; (3) whether it "has or should have assets and if not that the assets were properly disposed of and were arm's length transactions (or not)"; (4) whether it: (a) "improperly placed liabilities onto [its] books," (b) "failed to record assets or values on the books," (c) "had possession or control of unreported assets," (d) "made improper distributions"," (e) "had third parties or the defendants personally take value(s) that should have gone to or remained in the company," (f) improperly caused damage or disposed of assets," or (g) "improperly diverted monies or assets." *Id*.

As a verb in this context, "comment" means "to explain or interpret something by comment." *Comment*, MERRIAM WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993). As a noun, "comment" means, "a note explaining, illustrating, or criticizing the meaning of a writing," or "an observation or remark expressing an opinion." *Id*. "Comment" is also equated with "commentary," which is defined as, "a record of events usually written by a participant," or "a systemic series of explanations or interpretations (as of a writing)[.]" *Id*. The Court must not view the provisions concerning privilege and confidentiality in

isolation; to do so would result in an interpretation that nullifies the MOU's and, relatedly, the audit's purposes. *Stroh Ranch Dev.*, 935 F. Supp. at 1060 (noting that viewing contractual provisions in isolation could lead to contract interpretations that contradict the contract's purposes); *White River Vill.*, 2009 WL 792728, at *3 (noting that when two contractual clauses conflict, the clause that effectuates the contract's primary purpose controls). Accordingly, the MOU's plain meaning suggests that Mr. Horton was authorized to explain and interpret information he received from the LabX Parties regarding the disposition of Labyrinth Holdings LLC's funds and assets.

Although the MOU identifies multiple topics Mr. Horton must address in his Report, the MOU also states that "any documents *and information* provided to Mr. Horton by Defendants will be subject to a mediator's privilege and is [sic] to remain confidential and will not be subject to subpoena." *MOU* [#77-2] at 3, § IV(8) (emphasis added). [4] Defendants argue that "there is [no] ambiguity or inconsistency[.]" *Defs.' Brief* [#132] at 3. In response, Plaintiffs do not challenge Defendants' "no ambiguity" stance. *See*, *generally*, *Response* [#133]. But, as discussed, there is a conflict, irrespective of whether the parties acknowledge it.

The Court resolves this conflict by first applying contract construction principles. To reconcile the conflicting "audit reporting" and "mediator's privilege/confidentiality" provisions, the Court bears in mind the already described meanings of "conclusion,"

---

[4] The Engagement Letter also cloaks that information with confidentiality and privilege. *Engagement Letter* [#191-1] at 19 ("[T]he documents [the LabX Parties] shall provide shall remain confidential and privileged, even from Plaintiffs' counsel, *unless a Court of competent jurisdiction says otherwise*.") (emphasis added).

"determination," "reasonable," and "comment." The Court also considers the contract's primary purpose. As already stated, the parties entered into the MOU more than three years after this litigation commenced "to minimize further damage [and stress]" resulting from the litigation. *MOU* [#77-2] at 2. The parties agreed to the audit of Labyrinth Holding LLC's underlying finances because "this case pivots upon [those] underlying finances," and Plaintiff might choose to forgo litigation further litigation if Labyrinth Holdings LLC is truly judgment-proof. *See id*. at 2, §§ II, III; *Response* [#133] at 4. Therefore, any explanations of the auditor's conclusions serve the MOU's original purpose and should not be redacted or withheld.

In essence, Defendants ask Plaintiff to accept any conclusions by the auditor that "forensic inconsistences or improprieties were [or were not] found." *Engagement Letter* [#91-1] at 19. Such unadorned conclusions would not meaningfully assist Plaintiff in deciding whether to pursue this litigation or whether such pursuit makes strategic sense even in the face of potentially high costs for requisite discovery and retention of expert witnesses. Thus, the Court gives effect to the clauses that support the MOU's primary purpose, *i.e.*, the provisions that require Mr. Horton to provide a reasoned judgment—including explanations and interpretations of information—in support of his findings regarding Labyrinth Holdings LLC's financial condition. *See White River Vill.*, 2009 WL 792728, at *3 (noting that clauses that effectuate a contract's primary purpose will control, not a conflicting provision that detracts from the contract's primary purpose).

## B.    Application of the Blue-Pencil Rule

Next, the Court applies the "blue pencil" rule to axe provisions that are unreasonable or contrary to law. Section V(E) of the MOU unambiguously states that "a Court of competent jurisdiction shall have 'blue pencil' rights to modify this agreement pursuant to the law." *MOU* [#77-2] at 5, §V(B). Because the MOU has selected "Colorado Federal District Court" as the venue for resolving disputes, this Court may modify the agreement to sever any portions that are "declared invalid or unenforceable by a court of competent jurisdiction." *Id.*, §V(E).[5]

A court may "blue pencil" a contract to eliminate or modify unreasonable provisions, provisions that violate public policy, or provisions that are otherwise legally invalid. 17A Am. Jur. 2d *Contracts* § 313 (Jan. 2025 update); *see also CapitalValue Advisors*, 321 P.3d at 606 (discussing blue pencil rule). "Whether an invalid part of a contract may be severed from the remainder, however, depends generally upon the intention of the parties," as determined through rules of construction. 17A Am. Jur. 2d *Contracts* § 313.

Defendants rely on federal common law and Colorado's Dispute Resolution Act, Colo. Rev. Stat. § 13-22-301, *et seq.*, to support their argument that a mediator's privilege

---

[5] The Engagement Letter complements the MOU's severability provision. Specifically, the Engagement Letter contemplates that "a Court of competent jurisdiction," *i.e.*, a court in Sevier County, Tennessee, could deem the documents provided to Mr. Horton not privileged or confidential. *See Engagement Letter* [#91-1] at 19 ("the documents you shall provide shall remain confidential and privileged, even from Plaintiffs' counsel, unless a [c]ourt of competent jurisdiction says otherwise."). While this Court lacks the authority to enforce the Engagement Letter's provisions, that provision's existence informs the Court as to the LabX Parties' and Mr. Horton's intent. This provision suggests that those parties understood that their agreement on confidentiality and privilege could be invalidated by a court.

applies in this context. *See Defs.' Brief* [#132] at 9-10; *Reply* [#134] at 13-14. In response, Plaintiff argues that, unlike some other federal circuits, "the Tenth Circuit Court of Appeals has not recognized a mediator's privilege." *Response* [#133] at 9.

Defendants concede that the Tenth Circuit has not recognized a federal common law mediator's privilege, but they point to non-Tenth Circuit district court decisions that have acknowledged the existence of a mediator's privilege under state common law. *Reply* [#134] at 13 (citing *Sheldone v. Pa. Turnpike Comm'n*, 104 F. Supp. 2d 511, 515 (W.D. Pa. 2000); *Folb v. Motion Picture Indus. Pension & Health Plans*, 16 F. Supp. 2d 1164, 1179 (C.D. Cal. 1998)). They also argue that "[i]n civil cases, state law governs privilege regarding claims or defenses for which state law supplies the rule of decision" and that Colorado recognizes a mediator's privilege. *Reply* [#134] at 14 (citing COLO. REV. STAT. § 13-22-307 (Colorado Dispute Resolution Act's confidentiality provisions)).

The parties' arguments rest on an incorrect premise—the LabX parties' communications with Mr. Horton are not settlement communications and Mr. Horton is not a mediator. While the audit may yield information that leads the parties toward settlement, the LabX parties' provision of documents and information to Mr. Horton are not akin to the "free flow of information" that may result in the settlement of a dispute. *Accent Delight Int'l Ltd. v. Sotheby's*, 505 F. Supp. 3d 281, 286 (S.D.N.Y. 2020). Setting that faulty premise aside, the Court considers and rejects Defendants' arguments to find a privilege or confidentiality under federal common law, Colorado's Dispute Resolution Act, or Federal Rule of Evidence 408.

First, because the Tenth Circuit has not recognized a mediation privilege under federal common law, the Court declines to do so here. *See Gebremedhin v. Am. Fam. Mut. Ins. Co.*, No. 13-cv-02183-CMA-NYW, 2015 WL 4272716, *8 n. 5 (D. Colo. July 15, 2015) (noting lack of direction from Tenth Circuit regarding existence of a mediator's privilege under federal common law and that such privilege under state law "appears limited to communications 'made in the presence or at the behest of the mediator'") (quoting *Yaekle v. Andrews*, 195 P.3d 1101, 1009 (Colo. App. 2008)); *see also Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, No. 05-2164-MLB-DWB, 2007 WL 1246216, at *4 (D. Kan. Apr. 27, 2007) (declining to imply the existence of a "federal settlement privilege" in the absence of Tenth Circuit guidance). Moreover, this case is before the Court on diversity jurisdiction grounds, *see Compl.* [#1], ¶ 16; therefore, per Federal Rule of Evidence 501, state law (*i.e.*, Colorado) governs claims of privilege. *See Frontier Refin., Inc. v. Gorman-Rupp Co.*, 136 F.3d 695, 699 (10th Cir. 1998).

Second, state law provides no applicable privilege in this context. The Court finds that the Colorado's Dispute Resolution Act ("Act"), Colo. Rev. Stat. § 13-22-301, *et seq*. is inapplicable because it governs dispute resolution in state court proceedings and pre-suit disputes. *See*, *e.g.*, Colo. Rev. Stat. § 13-22-302(3) (defining "dispute resolution programs" and "mediation services" as processes utilized by the parties "whether or not an action has been filed in court"); Colo. Rev. Stat. § 13-22-305(1) (authorizing establishment of dispute resolution programs in judicial districts designated by the Colorado Supreme Court Chief Justice). Moreover, the Act is housed in Title 13 of the Colorado Revised Statutes, which governs state courts and state court procedures.

The Act's confidentiality provisions do not extend to parties' communications with an auditor—even if the auditor was initially retained to provide services that might lead to settlement or even if the auditor was later appointed by the Court to facilitate the audit's completion.[6] The Act specifically cloaks with confidentiality "any information concerning any mediation communication or any communication provided in confidence *to the mediator or a mediation organization*[.]" Colo. Rev. § 13-22-307(2) (emphasis added). Mr. Horton does not meet the Act's definition of "mediator," his audit services do not meet the definition of "mediation services" or "dispute resolution programs," and Defendants' communications with him do not meet the definition of "mediation communication." *See* Colo. Rev. Stat. § 13-22-302(4) (defining, "mediator" as "a trained individual who assists disputants to reach a mutually acceptable resolution of their disputes by identifying and evaluating alternatives"); *see also* Colo. Rev. Stat. § 13-22-302(2.4) (defining "mediation" as "an intervention in dispute negotiations by a trained neutral third party with the purpose of assisting the parties to reach their own solution"); § 13-22-302 (2.5) (defining "mediation communication" as "communication prepared or expressed for the purpose of,

---

[6] On June 27, 2024, the Court issued a Minute Order stating in relevant part, "Because the results of the audit will inform whether the parties will continue to litigate this dispute, the Court construes the audit as part of ongoing settlement efforts that began with the March 21, 2024 Settlement Conference [#98]. Therefore, all communications *with* counsel and the auditor to facilitate the audit[']s completion are deemed FRE 408 settlement communications." *Minute Order* [#113] (emphasis added). Notably, the Minute Order did not state that communications *between* counsel and the auditor are deemed FRE 408 communications; rather, the chosen "with" referred to communications between the Court, the auditor, and defense counsel for the purposes of facilitating the audit's completion. To the extent those communications among the auditor, defense counsel, and the Court were deemed settlement-related communications, the District's Local Rules governing alternative dispute resolution arguably apply. *See* D.C.COLO.LCivR 16.6. Those rules contain a confidentiality provision, which is limited to "any information concerning any communication provided in confidence to the magistrate judge in connection with an . . . alternative dispute resolution proceeding."

in the course of, or pursuant to, any mediation services proceeding or dispute resolution program proceeding"); § 13-22-302(3) (defining "mediation services" or "dispute resolution programs" as "a process by which parties involved in a dispute, whether or not an action has been filed in court, agree to enter into one or more settlement discussions with a mediator in order to resolve their dispute").

Third, the Court finds that Federal Rule of Evidence 408 does not cloak with confidentiality information that would explain Mr. Horton's conclusions. At the outset, the Court notes that Rule 408 is a rule of admissibility, not a rule of discoverability. Information need not be admissible to be discoverable. FED. R. EVID. 408(a) ("Evidence of the following is not admissible") and 408(b) ("The court may admit this evidence for another purpose"); FED. R. CIV. P. 26(b)(1). Therefore, "[Rule 408] does not prevent a party from discovering evidence relating to . . . statements made during settlement negotiations." *Garner v. Ranka*, No. 18-181 MV/GBW, 2020 WL 601898, at *2 (D.N.M. Feb. 7, 2020) (citing *Servants of Paraclete, Inc. v. Great Am. Ins. Co.*, 866 F. Supp. 1560, 1576 (D.N.M. 1994)); *cf. Ramada Dev. Co. v. Rauch*, 644 F.2d 1097, 1106-07 (5th Cir. 1981) (affirming trial court's exclusion of an architect's report that was commissioned by the plaintiff to serve as a basis for settlement negotiations regarding alleged construction defects); *United States v. Skeddle*, 176 F.R.D. 254, 256 (N.D. Ohio 1997) (barring admission of statements made by defendants facing charges of mail and wire fraud, money laundering, and tax evasion, who made those statements in an effort to facilitate settlement during an employer-commenced investigation regarding the alleged wrongdoing).

Additionally, the Court disagrees that communications between defense counsel and Mr. Horton are "mediation proceedings" and "compromise negotiations" and, therefore, fall within Rule 408's protections. *See Reply* [#134] at 15 (suggesting that those communications fall within the parameters of Rule 408 because they were made in "mediation proceedings" and "compromise negotiations"). Defendants' and defense counsel's communications with Mr. Horton were in furtherance of the audit, not to settle Defendants' disputes with Plaintiff—even if the audit's results would incentive the parties to settle. *Cf. In re Gardens Reg'l Hosp. and Med. Ctr., Inc.*, No. 2017 WL 2889633, at *3-4, *6-7 (Bankr. C.D. Cal. July 6, 2017) (concluding that discussions regarding the possibility of settlement, including potential settlement terms, were "'compromise negotiations' within the meaning of FRE 408"). Mr. Horton was not retained to discuss the possibility of settlement with or to convey potential settlement terms to Plaintiff. Moreover, the Engagement Letter expressly states that "[c]ommunications concerning the subject matter of the documents provided shall be only with [defense counsel] or [his] clients." *Engagement Letter* [#91-1] at 19. To the extent Mr. Horton was permitted to communicate with Plaintiff, any such communications were to help Mr. Horton "understand the case or the issues from both sides on an as needed basis[.]"). *Id.* (emphasis omitted).

## C.    Crime-Fraud Exception

At the November 15, 2024 Status Conference, the Court directed the parties to address the crime-fraud exception in their briefing on the privilege and confidentiality issues.

The crime-fraud exception serves to "assure that the seal of secrecy between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *Burton v. R.J. Reynolds Tobacco Co.*, 167 F.R.D.134, 140 (D. Kan. May 1, 1996) (citing *United States v. Zolin*, 491 U.S. 554, 563 (1989)).

Here, the at-issue information does not concern communications between Defendants and their attorneys; rather, it concerns information Defendants provided Mr. Horton, which Mr. Horton may have referenced in his audit report. Accordingly, the crime-fraud does not apply.

### IV. Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that Defendants' Motion for a Protective Order a/k/a **Defendants' Brief Concerning Privilege** [#132] is DENIED to the extent it seeks redaction of any explanations provided in Mr. Horton's audit report.

IT IS FURTHER **ORDERED** that Mr. Horton's audit report be released to the parties' counsel of record. A copy of that audit report will be separately docketed, following issuance of this Order.

IT IS FURTHER **ORDERED** that the audit report shall be filed under **Level 1 restriction**, which limits access to the parties (*i.e.*, their counsel) and the Court.

IT IS FURTHER **ORDERED** that the audit report be treated as "attorney's eyes only," subject to any party's challenge to that designation.

21

IT IS FURTHER **ORDERED** that Plaintiff's counsel may depose Mr. Horton regarding the conclusions he reached in his audit report.

IT IS FURTHER **ORDERED** that the parties shall file a joint motion for entry of a protective order, along with a proposed protective order by February 24, 2025.

Dated: February 10, 2025                    BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge